Zenith Ward, WSB #7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY 82003-0568
(307) 634-2184
fax (307) 634-2199
zsw@wyoming.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CARLIE SHERMAN, ANNA GOZUN, AMANDA NASH, and JOHN DOE on behalf of themselves and all similarly situated persons, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No.  20-CV-215-S |
| TRINITY TEEN SOLUTIONS, INC., a Wyoming corporation; TRIANGLE CROSS RANCH, LLC, a Wyoming limited liability corporation; MONKS OF THE MOST BLESSED VIRGIN MARY OF MOUNT CARMEL, d/b/a MYSTIC MONK COFFEE, a Wyoming corporation; GERALD E. SCHNEIDER; MICHAELEEN P. SCHNEIDER; ANGELA C. WOODWARD; JERRY D. WOODWARD; DANIEL SCHNEIDER; MATHEW SCHNEIDER; MARK SCHNEIDER KARA WOODWARD; KYLE WOODWARD THOMAS GEORGE; JUDITH D. JEFFRIS; DALLY-UP, LLC, a Wyoming limited liability corporation; ROCK CREEK RANCH, INC. A Delaware corporation, DIOCESE OF CHEYENNE, a Wyoming corporation; and the SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY, a Texas corporation; and NEW MOUNT CARMEL FOUNDATION, INC., a Wyoming corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS JUDITH D. JEFFERIS AND ROCK CREEK RANCH INC.'S BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

Defendants Judith D. Jefferis and Rock Creek Ranch, Inc. (hereinafter

"Defendants"), through their attorneys Buchhammer & Ward, P.C., move to dismiss the

claims of Plaintiffs against Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

## INTRODUCTION and BACKGROUND

Plaintiffs filed their First Amended Complaint (Complaint) on February 12, 2021 against numerous Defendants, including Judith D. Jefferis (Jefferis) and Rock Creek Ranch, Inc. (RCR). Jefferis is a shareholder in RCR. RCR owns a small ranch which neighbors Defendant Trinity Teen Solutions, Inc. (Trinity) in Park County Wyoming.

Plaintiffs have raised a host of claims and seek a class action based upon the operations of two ranches for troubled teens located in northern Wyoming, to wit: Trinity and Triangle Cross Ranch, LLC (Triangle Cross). A searching review of their claims reveals precious little detail regarding the actions or inactions of Defendants Jefferis and RCR[1]. Plaintiffs' First Amended Complaint fails to establish viable causes of action against Jefferis or RCR. Instead, they reveal Jefferis and RCR have been swept up in events not of their making by Plaintiffs who have cast their nets far too wide.

Notably, the reader must wade through 18 pages and 42 paragraphs of Plaintiffs' Complaint before finding a single reference to Jefferis or RCR. The Complaint reveals the following alleged facts regarding Jefferis and RCR: Jefferis is the owner/operator of RCR. (Complaint at ¶ 43). RCR is a Delaware corporation which operates a ranch adjacent to Trinity. (Complaint at ¶ 45). Prior to 2010, Trinity leased property from RCR and eventually purchased that property. (Complaint at ¶ 55). Plaintiffs' allege that the sale agreement

---

[1]

Plaintiffs had the benefit of reviewing Jefferis and RCR's Brief in Support of their Motion to Dismiss the original Class Action Complaint ("Complaint") prior to filing the Amended Complaint. In that Brief Jefferis and RCR made clear the substantial deficiencies within the original Complaint as it related to Jefferis and RCR. Despite having that information, Plaintiffs added no substantive or specific allegations of knowledge of the alleged coercion and mistreatment of Plaintiffs. Throughout the Amended Complaint, Plaintiffs include numerous specific allegations of other defendants' knowledge and use of coercion against Plaintiffs; however, there are no such factual allegations against Jefferis or RCR.

for the property included an agreement to provide labor for RCR and that Plaintiffs provided labor at RCR in the form of fence repair, cattle branding, cattle drives and stacking hay. (Complaint at ¶ 56). Finally, the Complaint alleges that Plaintiffs were not paid for their labor. Id. These are the entirety of the allegations against Jefferis and RCR.

Significantly, the allegations related to RCR and Jefferis only relate to two of the plaintiffs, Plaintiff Sherman and Plaintiff Gozun. (Complaint ¶¶ 115, 120). Sherman was last at Trinity in October 2015. (Complaint at ¶ 113). Gozun's was last at Trinity on August 1, 2012. (Complaint at ¶ 118).

It is critical that Plaintiff's Complaint fails to allege that Jefferis or RCR had any knowledge whatsoever of the alleged mal-treatment of the Plaintiffs. There are no allegations that Jefferis or RCR participated in the operations of Trinity or had any relationship with Triangle Cross. There are no allegations that Jefferis or RCR mistreated any Plaintiff or putative class member. There are no allegations that Jefferis or RCR participated in any way in the scheme to bully and intimidate Plaintiffs into providing labor. Instead, the Complaint portrays a relationship where Trinity Teen Solutions agreed to provide labor to RCR and did so using the labor of Plaintiffs. Those allegations are insufficient as a matter of law in supporting claims against RCR or against Jefferis individually.

The allegations that Trinity had an agreement to provide labor to RCR as part of their purchase of real estate are utterly baseless. While this motion is a motion to dismiss, the court can refer to the agreement between RCR and Defendant Dally-up in evaluating the motion. The Tenth Circuit has noted that if a plaintiff refers to a document in the complaint that is central to its claims, "a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997). "If the rule were otherwise,

a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." Id. at 1385.

In their effort to allege some sort of venture, Plaintiffs allege that RCR and Dally-up entered into a sale agreement "which included free labor and maintenance" on RCR property. (Complaint ¶ 56). RCR and Dally-Up entered into a Real Estate Purchase agreement for certain lands in June 2010. A copy of the Real Estate Purchase Agreement is attached hereto as Exhibit "A". Jefferis is not a party to the agreement. See Exhibit "A". The agreement includes all the usual terms of price, warranties of title, etc. Significantly absent from the agreement is anything that could be interpreted as a commitment to include free labor and maintenance. See Exhibit "A". Inviting troubled teens from a therapeutic facility adjacent to RCR's property and using them for free labor and maintenance was not contemplated in the Real Estate Agreement. In fact, the Real Estate Purchase Agreement makes clear that side-arrangements were not contemplated and were specifically nullified and excluded by including that its provisions are the only agreements between the party. See Exhibit "A" at ¶ 22.

## STANDARD OF REVIEW

In reviewing a motion made pursuant to Fed.R.Civ.P. 12(b)(6) this court is bound by the *Twombly* standard. *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014). "At this stage in the litigation, [the court] accept[s] as true the well pleaded factual allegations and then determine[s] if the plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

In determining the plausibility of a claim, "mere labels and conclusions and a

formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Han. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Instead a plaintiff must supply "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663, 129 S.Ct. 1937.

With respect to the motions to dismiss based upon statutes of limitations the critical issue is the date on which the action accrues. *Robert L. Koenlein Trust v. Kirchhefer*, 764 F.3d 1268, 1275 (10th Cir. 2014). "When the dates are not in dispute, the date a statute of limitations accrues is a question of law." *Bistline v. Parker*, 918 F.3d 849, 862 (10th Cir. 2019).

## ARGUMENT

Plaintiffs bring three separate claims against Jefferis and two against RCR, all under federal law. The first two claims are brought pursuant to the Trafficking Victims Protection Act of 2000 (TVPA). They assert claims against both Defendants Jefferis and RCR for forced labor under 18 U.S.C. § 1589(b) and for trafficking pursuant to 18 U.S.C. § 1590. Finally, they assert a claim under Federal Racketeer Influenced and Corrupt Organizations Act (RICO) solely against Jefferis. The mere vapor of allegations contained in Complaint are insufficient to support any of these claims.

### A.    Forced Labor Claim - 18 U.S.C. § 1589(b)

Plaintiffs do not allege that Defendants Jefferis and RCR are primary offenders in obtaining forced labor. Instead, Plaintiffs allege they benefitted from forced labor knowingly or with reckless disregard of the fact that they were receiving the benefits of forced labor. (Complaint ¶ 168). Liability under the statute can arise by benefitting financially from participation in a "venture" with the primary offender under Section 1589(b). *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). "[T]o succeed in avoiding dismissal of their § 1589 claims against defendants, plaintiffs must plausibly allege that they provided

labor or services that were procured by a method that is prohibited under the TVPA, and that the defendant knowingly benefitted from participating in this venture."   *Id.*

In this case, the claims are fatally flawed because they fail to plausibly allege that Jefferis and RCR participated in a "venture" and fail to allege that they knew or should have known that any of their co-defendants or any other persons were involved in conduct that violated the TVPA.

### 1.   No allegations of "venture".

"Venture" is not defined in section 1589, but other courts have used the definition of venture from 18 U.S.C. § 1591(e)(6). *Bistline*, 918 F.3d at 872; *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017).   That provision defines "venture" to mean "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). Adequately alleging the existence of a venture requires detailed allegations of both knowledge and benefit. *Id.*   Plaintiff's Complaint does not include any allegations of knowledge or benefit with respect to Jefferis or RCR.

The *Ricchio* and *Bistline* cases illustrate the detailed nature of pleadings needed in order to sufficiently allege knowingly participating in a venture.   In *Ricchio* the alleged venturers were owners of a hotel out of which the Plaintiff had been sex trafficked.   The Plaintiffs alleged, and the court emphasized, facts that the owners had profited from renting space to the offender.   The complaint included allegations that the defendants had the opportunity to regularly observe coercive and brutal behavior.   They had also ignored plaintiff's pleas for help to escape all of which collectively supported the claim that they were associated in fact in the violations. *Ricchio*, 853 F.3d at 555.

In *Bistline* the Tenth Circuit addressed claims against a law firm that had served as counsel for the head of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, Warren Jeffs.   The court emphasized allegations that the law firm defendant had assisted the offender, Mr. Jeffs, in evicting plaintiffs, and were directly involved in other strategies

intended to control the plaintiffs. *Bistline*, 918 F.3d at 874. The court cited allegations that the law firm defendant had been directly informed of Jeff's efforts to enslave the plaintiffs in visiting with him about proposed legal work. *Id.* It was only in this context that the court concluded that there was a venture and that the law firm knowingly benefitted from the venture.

In both cases there were concrete and detailed allegations that the Defendants knew or certainly should have known that the plaintiffs were being utilized as forced labor. Here, there are no such allegations. Plaintiffs' only allegation of benefit is that the girls from Trinity provided labor to RCR and Jefferis[2]. There are no allegations that RCR or Jefferis knew that Trinity was allegedly trafficking the girls at the ranch. There are no allegations that RCR was aware of the alleged abuse and control, or that either was exposed to information that would have reasonably provided either notice of the same. There are no allegations that RCR or Jefferis in anyway condoned or facilitated the alleged abuse or control. Because of the deafening absence of these allegations, the force labor claims against RCR and Jefferis should be dismissed.

### 2. No allegations of "knowing" conduct.

Courts have recognized venture liability under the forced labor provision of the TVPA where a defendant who benefitted from a venture had knowledge of the abusive means by which labor was obtained. *See e.g. Gilbert v. United States Olympic Comm.,* 423 F. Supp. 3d 1112, 1131 (D. Colo.2019) (finding that female taekwondo athletes stated a §I589(b) claim against a national governing body for taekwondo where plaintiffs alleged that they reported their coach's sexual abuse to the national governing body and that it purposefully delayed investigating those complaints so the coach could participate in the 2016 Olympics).

---

[2] Importantly, Plaintiffs draw no distinction between these two defendants and fail to explain how providing ranch work to RCR benefitted Jefferis individually.

However, courts refuse to find venture liability where the defendant is unaware of the allegedly unlawful conduct. *See, e.g., Jensen v. United States Tennis Ass 'n*, No. 20-2422-JWL, 2020 WL 6445117, at \*6 (D. Kan. Oct. 30, 2020) (finding plaintiff failed to state a claim for venture liability under § 1589(b) because she failed to plausibly allege facts that the tennis organization knew or recklessly disregarded the fact that a coach within the organization was abusing her). In *Jensen*, the court granted defendant's motion to dismiss noting: "plaintiff does not allege that she ever notified [the tennis organization] about [the coach's] conduct and she does not allege that anyone employed by [the tennis organization] witnessed [the coach's] conduct or otherwise had any reason to know about [the coach's] conduct." *Id.*

Section 1595 is the statute that authorizes a civil remedy to victims of forced labor. It limits the availability of civil remedies to those who received benefits who also "knew or should have known" that the offending party engaged in conduct in violation of the TVPA. 18 U.S.C. § 1595. Here, Plaintiffs do not allege any facts which would suggest that Jefferis or RCR had any inkling of the offending conduct or facts indicating that they should have known of violations of the TVPA. The fact that RCR neighbored Trinity's property certainly would not impute knowledge of what goes on upon that property. Similarly, allegations that the girls occasionally came to RCR to participate in brandings and cattle drives raises no particular facts that would lead an ordinary person to conclude that TVPA violations were occurring. There are no allegations that Plaintiffs ever said anything to Jefferis, RCR, or any agent or employee of either regarding any mistreatment or misconduct. Instead, the allegations are completely consistent with what RCR and Jefferis would have seen from a lawfully operated ranch for troubled teens.

RCR is a corporation and therefore Plaintiffs must rely on an agency theory in order to hold it liable for knowingly committing misconduct. See *U.S. v. A&P Trucking Co,* 358 U.S. 121, 125 (1958) (avowing that "entities can be guilty of 'knowing' or 'willful violations

of regulatory statutes through the doctrine of respondeat superior.") Under the doctrine of

respondeat superior, when the relationship of principal and agent is at issue, the party

alleging agency has the burden of proving the existence and nature of that relationship.

*Hull v. D'Arcy*, 202 P.3d 417, 422 (Wyo. 2009); *Fowler v. Westair Enters., Inc.,* 906 P.2d

1053, 1055 (Wyo. 1995). There is no presumption that an agency relationship exists.

*Hamilton v. Natrona County Educ. Ass'n*, 901 P.2d 386 (Wyo. 1995); *Holliday v. Bannister*,

741 P.2d 95 (Wyo. 1987). A principal can only be liable for actions by the agent within the

scope of that agency. *Hamilton*, 901 P.2d at 385 (citing *Miller v. Reiman-Wuerth Co.*, 598

P.2d 20, 22 (Wyo. 1979). *See also, Austin v. Kaness*, 950 P.2d 561, 563 (Wyo. 1997);

*Killian v. Caza Drilling, Inc.*, 131 P.3d 975, 978-79 (Wyo. 2006); *Eklund v. PRI*

*Environmental, Inc.*, 25 P.3d 511, 515 (Wyo. 2001). To determine whether one is acting

within the scope of agency, plaintiffs must articulate that the actions complained of are the

kind of work the agent was employed to perform, that the work occurred substantially within

the authorized time and space limits, and that the work was actuated by a purpose to serve

the principal. *Id.* None of the facts alleged in the Amended Complaint establish an agency

relationship between any other defendant and RCR.

## B.    Trafficking - 18 U.S.C. § 1590

While Plaintiff relies upon the same conduct to support both its claims, the basis for

claims under 18 U.S.C. §§ 1589(b) and 1590 are quite different. Section 1590 provides:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any
> means, any person for labor or services in violation of this chapter shall be
> fined under this title or imprisoned not more than 20 years, or both . . . .

18 U.S.C. § 1590.

It is fundamental that for liability under 1590 Plaintiffs must demonstrate or explain

how defendants recruited, harbored, provided or obtained their services, a necessary

element to prove trafficking under this statute. *Aguirre v. Best Care Agency, Inc.*, 961

F.Supp.2d 427 (E.D.N.Y. 2013); *Samirah v. Sabhnani*, 772 F.Supp.2d 437, 447 (E.D.N.Y.

2011). Courts have noted that section 1590 requires allegations that the defendant recruited the victim or otherwise obtained their labor or services as the text of the statute requires. *Ali v. Khan*, 336 F.Supp.3d 901, 907 (N.D. Ill. 2018). Without this element, Plaintiff's trafficking claim under this statute is nothing more than her forced labor claim restated. *See Shuvalova v. Cunningham*, No. 10–CV–02159, 2010 WL 5387770, at *4 (N.D.Cal. Dec. 22, 2010) (holding that plaintiffs failed to state a distinct claim for trafficking, as opposed to forced labor, where the only allegations regarding defendants' conduct prior to plaintiffs' arrival at the property were that one defendant "promised to take care of [plaintiffs] in a loving home" (internal quotation marks omitted)).

Here Plaintiffs make no effort to allege that Defendants Jefferis or RCR recruited, harbored, transported, provided or obtained persons for services in violation of statutes. Instead, they make the single allegation that the Plaintiffs and putative plaintiffs provided labor to the Defendants.   (Complaint ¶ 56). Without more, the allegations fall well short of what is needed to avoid dismissal. *Gilbert v. United States Olympic Committee*, 423 F.Supp.3d 1112, 1133-1134 (D. Colo. 2019); *Mojsilovic v. Oklahoma ex. rel. Board of Regents for the University of Oklahoma*, 2015 WL 1542273 *5 (W.D. Okl. 2015).

The Complaint is absolutely clear that Jefferis and RCR had nothing to do with recruiting teens or getting them to Trinity. To the contrary the allegations place the responsibility for recruiting and obtaining the Plaintiff's services on Trinity and Triangle Cross. (Complaint ¶ 57).   The fact that the Complaint includes allegations that Trinity transferred plaintiffs to RCR in order to provide labor does nothing to save the claim. "In cases where a defendant was not involved in initially recruiting a plaintiff, the defendant will be an appropriate defendant under § 1590 when it has transported the plaintiff to a separate location, where the plaintiff was under its complete, *long-term* control". *Copeland v. C.A.A.I.R., Inc.*, 2019 WL 4307125 *9 (N.D. Okl. 2019) (citing *Lagayan v. Odeh,* 199 F. Supp. 3d 21, 29-30 (D. D.C. Aug. 2, 2016) (emphasis added); *Lagasan v.*

*Al-Ghasel*, 92 F. Supp. 3d 445, 454 (E.D. V.A. Feb. 18, 2015); *Butigan v. Al-Malki*, No. 1:13cv514, 2014 U.S. Dist. LEXIS 197327, *14 (E.D. V.A. Apr. 2, 2016)). Here, there are no such allegations.

This case is somewhat akin to the case of *Shuvalova v. Cunningham*, No. 10–CV–02159, 2010 WL 5387770, at *4 (N.D.Cal. Dec. 22, 2010) where the Plaintiff alleged that the Defendant fraudulently induced them to come to his ranch. The court noted that this fraudulent inducement did not spell out a claim under section 1590 and the allegations of the defendant's conduct once plaintiffs arrived at the ranch were irrelevant to claims under section 1590. *Id.* Here there are no allegations that Jefferis or RCR had any role whatsoever in recruiting the Plaintiffs. Even if there were allegations related to the time that the Plaintiffs were on the premises at RCR those would be insufficient to carry the day under section 1590.

### C.   RICO

Plaintiff's bring their RICO claim against Defendant Jefferis, but not RCR. A RICO claim must allege a violation of 18 U.S.C. § 1962. The elements of a civil RICO claim are: "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261-62 (10th Cir. 2006).

It is notable that this claim is only brought against Jefferis. While the allegations against RCR are sparse, the allegations related to Jefferis are almost non-existent. The Complaint tells us that she owns RCR and manages RCR. There are no allegations that any of her actions were undertaken in a capacity other than as a corporate representative. Plaintiffs' thread-bare allegations assert that "[a]s alleged herein . . . Judith Jefferis . . . conducted the affairs of [Trinity] and [Triangle Cross] through a pattern of racketeering activity by repeatedly violating 18 U.S.C. §§ 1589 & 1590." (Complaint ¶ 180). However, a searching review of the Complaint shows that nowhere do Plaintiffs suggest that Jefferis "conducted the affairs of [Trinity] and [Triangle Cross]". In fact, there are zero allegations

that Jefferis had anything whatsoever to do with Triangle Cross.

### 1.    Failure to adequately allege predicate acts.

Because RICO requires a Defendant to participate in a pattern of racketeering activity, a plaintiff must allege sufficient racketeering activity as a predicate to a viable RICO claim. *Tal*, 453 F.3d at 1261-62 (10th Cir. 2006).    The RICO statute defines "racketeering activity" in 18 U.S.C. § 1961 and includes any act indictable under specified federal statutes.  Included among those statutes are 18 U.S.C. §§ 1589 and 1590.

As outlined above, the Plaintiffs have failed to adequately allege predicate acts (violations Sections 1589(b) and 1590). As a result, their RICO claims fail.  However, there are additional independent defects in their RICO claims that also cause them to fail under their own weight.

### 2.    Statute of Limitations.

"Civil RICO damages claims are subject to a four-year statute of limitations." *Robert L. Kroenlein Trust v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). The Tenth Circuit has also noted that "[t]he civil RICO limitations provision is particularly significant in light of civil RICO's objective of 'encouraging prompt litigation to combat racketeering.'" *Id.* at 1275 (quoting *Rotella v. Wood*, 528 U.S. 549, 552, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000)). The Tenth Circuit has indicated that except in exceptional circumstances it is likely to apply the injury-occurrence rule when determining when a cause of action occurs. *Id.*; *Bistline*, 918 F.3d at 863. This means that the statute of limitations begins to run when the cause of action "accrues" or when the plaintiff can file suit and obtain relief. *Robert L. Kroenlein Trust*, 764 F.3d at 1274.  Here, where the Complaint raises no issue about the discovery of the injury, the injury occurrence rule is appropriate.

Given the Plaintiff's allegations, the accrual of the action is clear. Here Jefferis (actually RCR) is only alleged to have been involved in the claims of two plaintiffs, Sherman and Gozun. (Complaint ¶¶ 115, 120). The Complaint plainly states Sherman was

last at Trinity in October 2015. (Complaint at ¶ 113) and Gozun was last at Trinity on August 1, 2012. (Complaint at ¶ 118). That necessarily means that any labor provided to RCR had to occur prior to those dates. Given those allegations Sherman was required to bring her claim by October 2019 and Gozun was required to bring her claim by August 1, 2017. Both dates expired long before the filing of the Complaint consequently the claims are barred by RICO's statute of limitations.

### 3.    No allegation of investment in control or conduct of an association-in-fact enterprise.

Plaintiffs' claims also fail because they fail to allege the necessary "association-in-fact enterprise." An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.' " *Boyle v. United States*, 129 S.Ct. 2237, 2244, 556 U.S. 938, 946, 129 S.Ct. 2237 (2009)(citation omitted). Such an entity "need not have a hierarchical structure or a 'chain of command....'" *Id.* at 948, 129 S.Ct. 2237. For it to exist requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S.Ct. 2237.

As explained by the Tenth Circuit, in order to maintain a § 1964(c) claim against any particular defendant, Plaintiffs need to have alleged facts plausibly demonstrating that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 883 (10th Cir. 2017) (quoting 18 U.S.C. § 1962(c)). "This, in turn, requires a showing that the defendant 'participate[d] in the operation or management of the enterprise itself.' " *George v. Urban Settlement Services*, 833 F.3d 1242, 1251 (10th Cir. 2016)(quoting *Reves v. Ernst and Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). "Under Reves' operation or management test, the defendant must have 'some part in directing' the enterprise's affairs." *Id.* (quoting *Reves*, 507 U.S. at 179, 113 S.Ct. 1163). This requires more than simply providing services or goods through its regular course of business that

may ultimately benefit the enterprise.  *Id.*

Here there are no allegations that Jefferis in any way participated in the operation and management of the alleged enterprise.  The Complaint lays out a clear picture of incidental involvement where girls at the Trinity Ranch came to RCR to provide some labor during brandings and trailing of cattle.   The Complaint does not even allege Jefferis had an individual role in Trinity's enterprise. Because Plaintiffs make no effort to allege that Jefferis acted in the enterprise's affairs as required by *Reves*, the RICO claim must be dismissed.

### 4.     No allegation of injury to business or property.

Central to liability under Section 1964(c) is the requirement that Plaintiff have suffered some form injury to their business or property. 18 U.S.C. § 1964(c).  Section 1964(c) provides for civil remedies for "[a]ny person injured in his business or property by reason of a violation of a [S]ection 1962" of RICO. "A plaintiff has standing to bring a RICO claim only if he was injured in his business or property by reason of defendant's violation of § 1962." *Gillmore v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007).  Although RICO is to be read broadly, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), "[t]he phrase 'business or property' also retains restrictive significance." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Thus, as a basic rule, injury to business or property " 'requires proof of a concrete financial loss and not merely injury to a valuable intangible property interest.' " *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoted with approval by *Ivar v. Elk River Partners, LLC*, 705 F.Supp. 2d. 1220, 1232 (D. Colo. 2010)); see also *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728 (8th Cir.2004) (" '[A] showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest.' " (quoting Steele, 36 F.3d at 70)); *In re Taxable Municipal Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir.1995) (noting that RICO does not protect an "intangible property interest"); *Price*

v. Pinnacle Brands, Inc., 138 F.3d 602, 607 (5th Cir.1998) ("Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing."); In re Bridgestone/Firestone, Inc. Tires Products Liability Litig., 155 F.Supp.2d 1069, 1090 (S.D.Ind.2001) ("Federal courts have consistently and repeatedly held that to satisfy the injury requirement of section 1964, a plaintiff must prove an actual, concrete, monetary loss."). Plaintiffs allege no such an injury. Instead, Plaintiffs allege restitution of amounts paid to Trinity and Triangle Cross Ranch (Complaint ¶ 146), compensatory damages for personal injury, (Complaint ¶¶ 145, 147) and they allege damages for unpaid wages (Complaint ¶ 143).

Plaintiffs are sure to point to their claim for unpaid wages and argue that those damages constitute an injury to property and business. That, however, is not the case. Certainly, lost wages resulting from being involuntarily held constitute pecuniary loss, but that is loss resulting from the personal injury of being wrongfully enslaved. Courts have regularly noted that pecuniary losses flowing from personal injuries are insufficient to provide standing under § 1964(c). Evans v. City of Chicago, 434 F.3d 916, 926 (7th Cir. 2006) (overruled on other grounds Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013)).

In the Evans case the plaintiff filed a RICO complaint and argued that his inability to seek gainful employment because he had been falsely imprisoned constituted an injury to business or property. Evans, 434 F.3d at 926. He pushed the Seventh Circuit to recognize the claim as an injury to property or business conferring standing under RICO. Id. The court did not bite, stating:

> The loss of income as a result of being unable to pursue employment opportunities while allegedly falsely imprisoned -- similar to monetary losses flowing from the loss of consortium, loss of security and peace, wrongful death and similar claims sounding in tort – are quintessentially pecuniary losses derivative of personal injuries arising under tort law . . . Evans' claim of loss of employment income is nothing more than an indirect, or secondary effect, of the personal injuries that he allegedly suffered, the inability to seek or obtain employment, and therefore such a claim does not constitute a cognizable injury to "business or property" within the meaning of § 1964©.

Id. at 926-927.

Here Plaintiffs specifically allege that because they were being forced to provide labor for Trinity and Triangle Cross Ranch, they were unable to seek employment and provide their services for pay. The pay claim is the secondary effect of forced labor. Here as in *Evans*, such a claim does not confer standing under RICO.

Because Plaintiffs have not alleged a cognizable injury to "business of property" they do not have standing to bring their civil RICO claim and it must be dismissed. *Gilbert v. United States Olympic Committee*, 423 F.Supp.3d 1112, 1144-1145 (D. Colo. 2019).

## CONCLUSION

Plaintiffs allege significant wrongs and significant injury through the course of their Complaint against Defendants other than Jefferis and RCR. In seeking to right those wrongs Plaintiffs have cast their net far too wide and consequently implicated innocent parties including Judith Jefferis and Rock Creek Ranch, Inc. Plaintiffs have a threshold obligation to allege sufficient facts to support the legal claims that they assert against these defendants. They have not done so, but have instead painted them with a broad brush of innuendo and recitation of statutory elements which bear no meaningful legal weight. That approach is not sufficient under this court's Rule 12(b)(6) standard and consequently the claims against Jefferis and RCR should be dismissed.

DATED this 26th day of March, 2021

Judith D. Jeffris and Rock Creek Ranch, Inc.,
Defendants.


By:

Zenith S. Ward, WSB # 7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY  82003-0568
(307) 634-2184
(307) 634-2199 – fax
zsw@wyoming.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all parties per the CM/ECF electronic service of the Court, this _____ day of March, 2021.


_____
Zenith S. Ward

# REAL ESTATE PURCHASE AGREEMENT

This Agreement is made by and between **Rock Creek Ranch, Inc.,** a Delaware corporation, as "Seller" and Dally Up, LLC, a Wyoming limited liability company,  of Clark, Wyoming, as  "Buyer." In consideration of the mutual promises contained herein, the Seller and the Buyer agree as follows:

**1.0** **Purchase and Sale.** Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, an undivided one hundred percent (100%) interest in certain real property (the "Real Property") located in Park County, Wyoming, and described on attached **Exhibit A.**

**2.0** **Purchase Price.** The total purchase price for the Real Property (the "Purchase Price") shall be Six Hundred Thousand ($600,000.00) payable as follows:

**2.1** Within three (3) days of execution of this Agreement, Buyer shall pay to Seller, in cash or certified funds, an earnest money deposit of Sixty Thousand Dollars, being ten percent (10%) of the purchase price. In the event Seller does not hold merchantable fee title to the Real Property enabling the Seller to convey merchantable fee title to Buyer, or in the event Buyer is unable to obtain financing for the purchase of the Real Property, or in the event the Real Property does not appraise for at least $600,000.00,  or in the event that there is a default on the part of Seller, this sum shall be returned to Buyer.  In the event there is a failure to close this agreement due to a default on the part of Buyer, this sum shall be retained by Seller as liquidated damages.

**2.2** The remaining balance of Five Hundred and Forty Thousand Dollars ($540,000.00), shall be paid by Buyer to Seller in cash or certified funds at closing.

**3.0** **Date of Closing and Delivery of Possession.** Closing of the transaction contemplated by this Agreement shall be held on or before July 26, 2010, at a time and place mutually agreed upon by the Parties.  Possession shall be given on the date of closing.

**4.0** **Title.** Title shall be conveyed to Dally Up, LLC.

**EXHIBIT A**

**5.0**   **Costs.**   Except as provided in this Agreement, Buyer shall be solely responsible for all costs and closing costs associated with inspections of the Real Property and improvements thereon, appraisals, loan origination and related charges for financing of the purchase of the Real Property, and any and all other costs for which the Buyer may incur in connection with this transaction.   Except as provided in this Agreement, all other costs not specifically allocated shall be divided equally between Seller and Buyer.

**6.0**   **Merchantable Title.**

**6.1**   Within ten (10) days after execution of this Agreement, Seller, at its expense, shall cause to be delivered to Buyer a commitment for title insurance issued by a title insurance company authorized to do business in Park County, Wyoming, showing good and merchantable fee simple title to the Real Property in Seller.  The commitment for title insurance shall be subject only to (i) the general exceptions contained in the commitment; (ii) exceptions and reservations contained in the patents from the United States; (iii) prior mineral reservations; (iv) easements, restrictions and rights-of-way of record; and (v) title exceptions which may be removed by the payment of money at the time of closing and which Seller agrees and covenants to so remove at closing.

**6.2**   In the event Seller's title is not good, marketable, and reasonably acceptable to Buyer, Buyer shall provide a written statement of its objections to title at least fourteen (14) days prior to the closing date. Seller shall then have a reasonable time in which to take such curative action as may be necessary, which shall be done at Seller's expense, or, at Seller's option, Seller may rescind this Agreement, provided that Buyer shall be given a reasonable opportunity to waive objections to title prior to any rescission of this Agreement.

**6.3**   Within thirty (30) days after the closing of this transaction, Seller agrees to deliver a title insurance policy in the full amount of the purchase price, insuring title to an undivided one hundred percent (100%) interest in the Real Property in the name of Buyer. The title insurance policy shall show title in Buyer subject only to:

(i)   the general exceptions in the commitment;

2

(ii)    exceptions and reservations in the patents from the United States;

(iii)   prior mineral reservations;

(iv)   easements, restrictions and rights-of-way of record; and

(v)    any mortgage given by Buyer to secure payment of all or any part of the Purchase Price for the Real Property as described above.

**7.0    Warranty Deed with Restrictions.** At closing, Seller shall convey the property Described in **Exhibit A** to Buyer by the warranty deed with restrictions in attached **Exhibit B**. Buyer agrees to abide by and adhere to the terms and conditions contained in the warranty deed in **Exhibit B**, the terms, conditions, and restrictions of which are hereby incorporated into this Agreement as if fully set forth herein. Buyer hereby represents and warrants to Seller that Buyer shall abide by and adhere to all terms, conditions and restrictions contained in the warranty deed in **Exhibit B** and that this representation and warranty of Buyer shall survive the closing of this transaction.

**8.0    Mineral Rights.** Mineral rights, if any, owned by Seller, shall be conveyed to Buyer, and are deemed included in the purchase made by Buyer under this Agreement.

**9.0    Water.** All water and water rights, ditches and ditch rights, ownership documents representing such water and ditch rights, and ditch easements appurtenant to or used in connection with the Real Property are deemed included in the purchase made by Buyer under this Agreement.

**10.0    Risk of Loss.** Risk of loss to the Real Property shall remain with Seller until delivery of possession to Buyer. In the event the premises are damaged by fire or other casualty prior to the time risk of loss passes to Buyer, Seller shall be obligated to repair the damage, or, in the alternative, assign to Buyer funds, including insurance proceeds, in an amount sufficient to repair the damage, provided that, in the event of an occurrence causing damage to the Real Property exceeding $10,000.00 prior to the Closing Date, either party may terminate this Agreement and the earnest money shall be returned to Buyer.

**11.0    Representations and Warranties of Seller.** Seller hereby represents and warrants to Buyer as follows, which representations and warranties shall be effective as of the date of this Agreement and as of the closing date and shall survive the closing of this transaction:

3

**11.1** Seller holds good and marketable title to the surface lands described on **Exhibit A**, free and clear of any liens, claims, and encumbrances except those which can be removed and will be removed by Seller at the time of closing, and Seller has the right and authority to convey to Buyer the subject interest in and to the Real Property;

**11.2** To the best of Seller's knowledge, the Real Property is not in violation of any federal, state, or local law relating to environmental conditions on, under or about the property, including but not limited to soil and groundwater conditions; to the best of Seller's knowledge, there has been no disposal, release, or threatened release of hazardous materials on the property; and during the ownership of the property by Seller, there has been no litigation or administrative enforcement action or proceeding brought or threatened to be brought alleging the presence, disposal, release, or threatened release of any hazardous materials on the property;

**11.3** To the best of Seller's knowledge there are no agreements or permits for trespass, timbering, mineral exploration or development, or other use of the Real Property which exist and which are not of record in the Office of the County Clerk of Park County, Wyoming; and

**11.4** The transaction described in this Agreement has been duly authorized by Seller.

**12.0** **Items Included in the Purchase Price.** The purchase price shall include all fixtures and appurtenant property, including but not limited to fences, gates, lighting, electrical and plumbing fixtures, heating systems and fixtures, heating stoves, fireplaces and fireplace inserts, outdoor plants, air conditioning equipment, built-in appliances, floor coverings, storm windows and doors, screens, curtain and drapery rods, garage door openers and controls, smoke and fire detection devices, television antennas, mirrors, awnings, water softeners, water pumps, water filters and other water treatment equipment

**13.0** **Real Property Taxes.** Seller represents that all taxes and assessments for 2009 and all years prior to the year of closing will be paid in full prior to or at closing. Real property taxes for the year 2010, personal property taxes and assessments, if any, shall be prorated between Buyer and Seller as of the date of closing. Buyer shall pay all subsequent taxes and assessments.

**14.0    Closing Agent.** Shoshone Title shall act as closing agent for this transaction and shall hold all earnest money and other documents relevant to this transaction.

**15.0    Default.**

**15.1** Failure of any party to perform in accordance with the time limits set forth in the Agreement may be deemed a default and entitle the other party to all remedies provided at law, including the right of specific performance.

**15.2** In the event either of the parties default in any of the covenants herein or fails to close so as to require the party not in default to commence a legal or equitable action against the defaulting party, the defaulting party agrees to pay all reasonable expenses of such litigation, including a reasonable amount for attorney's fees.

**16.0    Notices.** All notices given pursuant to this Agreement shall be sent by certified mail, postage prepaid, to the parties as follows:

        Seller: Rock Creek Ranch, Inc.
             c/o Judith Jefferis
             P.O. Box 687
             Unionville, PA 19375-0687

        Buyer: Dally Up, LLC
             89 Road 8RA
             Clark, WY 82435

Notices are deemed given five (5) days after mailed in accordance with this paragraph.

**17.0    Condition of the Property.** Buyer enters into this Agreement in full reliance upon Buyer's independent investigation and judgment. Buyer understands that at closing, Buyer shall take the Real Property in its present condition "AS IS" with no warranty as to condition. Buyer is not relying upon any representations by Seller or Seller's agents, except as set forth in this Agreement, as to any condition which Buyer deems to be material to Buyer's decision to purchase the Real Property. Except as otherwise provided herein, Buyer accepts the Real Property in its present condition, and **Seller makes no express or implied warranties of habitability or fitness to Buyer.**

This disclaimer shall not be merged into or extinguished by any warranty deed delivered under this Agreement.

### 18.0   Due Diligence.

18.1   The closing of this Agreement is conditioned upon Buyer's due diligence examination of the Real Property and all improvements located on the Real Property.  During the due diligence period, which begins on the date of complete execution of the Agreement and ends fourteen (14) days thereafter at 5:00 p.m. Mountain Standard Time, Buyer shall be entitled, at Buyer's sole  expense, to conduct any inspections, tests, and studies for the purpose of satisfying Buyer as to the acceptability and suitability of the Real Property for Buyer's intended use.

18.2   Buyer and Buyer's agents shall be allowed access to the Real Property at all reasonable times for the purpose of making inspections and conducting tests and studies.  Buyer shall not damage the Real Property or any improvements thereon in connection with any tests, inspections or studies performed pursuant to this section.  Buyer shall not permit any construction or materialmen's liens to be filed against the Real Property as a result of tests and studies.   Buyer shall indemnify Seller for any damage, cost or expense, including  reasonable attorneys' fees incurred by Seller, as a result of Buyer's tests inspections, or studies.

18.3    On or before the end of the due diligence period, Buyer shall have the right to (i) terminate this Agreement by written notice to Seller, if Buyer determines, in Buyer's sole discretion, that the Property is not satisfactory, or (ii) provide Seller a written list of objections and concerns.  Unless Buyer provides Seller a written notice of termination or Buyer's list of objections and concerns prior to the expiration of the due diligence period, Buyer shall accept the condition of Real Property and improvements thereon as is and this Agreement shall continue in full force, and the earnest money shall thereafter be nonrefundable to Buyer except as otherwise provided herein.

18.4    If the Buyer provides to Seller a list of objections and concerns within the time provided above, Seller and Buyer shall have until Noon Mountain Standard Time three (3) days after the delivery of the list of objections and concerns to attempt to resolve the objections and concerns

6

of Buyer. If Seller elects not to correct or if the objections and concerns are not resolved to Buyer's satisfaction within three (3) days of delivery of the list of objections and concerns, this Agreement may be terminated by Buyer by a written notice of termination given to Seller not more that three (3) days thereafter, in which event, this Agreement shall be terminated, the earnest money shall be returned to Buyer and the parties shall have no further obligations herein. If no such notice of termination is timely given, then any unresolved list of objections and concerns shall be deemed waived and this Agreement shall continue in full force and effect.

**19.0   Real Estate Commission.** It is agreed that neither Seller nor Buyer have incurred any real estate fees or commissions in connection with the purchase of this Property. In the event that either party has incurred such fees or commissions, the party incurring those fees and commissions shall pay the same.

**20.0   Legal Fees.** The Parties agree that each is responsible for their own legal fees associated with preparing this Agreement, entering into, and completing the transaction described in this Agreement.

**21.0   Further Assurances.** Seller agrees to use its best efforts to obtain and to execute such other documents as may be required to consummate the transaction contemplated herein.

**22.0   Entire Agreement.** This Agreement supersedes all prior agreements and understandings and sets forth the entire agreement of the parties and may not be changed or terminated orally. No attempted change, termination or waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by all of the parties to this agreement.

**23.0   Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Wyoming.

**24.0   Execution in Counterparts and by Fax.** This Agreement may be executed in counterparts and by fax.

**25.0   Binding Effect.** This Agreement shall be binding upon and enure to the benefit of the parties named herein and their respective personal representatives, heirs, successors and assigns.

**26.0   Sale Subject to Appraisal and Financing.** Seller agrees that the sale of the Real Property is subject to the ability of Buyer to receive an appraisal of the real property in the amount of at least $600,000.00, and the ability to obtain financing in the

7

amount of $600,000.00.   If Buyer is unable to obtain the appraisal and financing as
outlined herein by the closing date, Seller agrees that all earnest money paid as outlined
in Paragraph 2.1 herein shall be refunded to Buyer.

THE REMAINDER OF THIS PAGE HAS BEEN LEFT

INTENTIONALLY BLANK-----SIGNATURE PAGE

TO FOLLOW

DATED this ⟨ 10 ⟩ day of June, 2010.

**SELLER**          **ROCK CREEK RANCH, INC.**

By: Judith Donaldson Jefferis

Title: President

**BUYER**          DALLY UP, LLC

By: JERRY WOODWARD, Member

By: ANGIE WOODWARD, Member

9

STATE OF _Wyoming_ )
                          ) ss,
COUNTY OF _Park_ )

The foregoing **Real Estate Purchase Agreement** was acknowledged before me this _10th_ day of _June_, 20_10_, by _Judy Jeffers_, President of Rock Creek Ranch, Inc., as Seller.

WITNESS my hand and official seal.

_Chris Dell Edwards_
Notary Public
My commission expires: _9/27/2013_


STATE OF _Wyoming_ )
                          ) ss.
COUNTY OF _Park_ )


The foregoing **Real Estate Purchase Agreement** was acknowledged before me this _22_ day of _June_, 20_10_,by Jerry Woodward and Angie Woodward, all the members of Dally Up, LLC, as Buyer.

WITNESS my hand and official seal.

_Clemens_
Notary Public
My commission expires: _4-27-13_

JOY M. CLEMENS    NOTARY PUBLIC
COUNTY OF          STATE OF
PARK               WYOMING
MY COMMISSION EXPIRES APRIL 27, 2013

10



# HOLM, BLOUGH and COMPANY

CONSULTING ENGINEERS AND LAND SURVEYORS
1402 Stampede Avenue, Cody, WY 82414
(307) 587-6281
Fax 587-6282
Email: hbco@tritel.net

Roy Holm, PE & LS
Paul Blough, LS

June 10, 2010
Job No. 07-333

### ROCK CREEK RANCH, INC.
### LEGAL DESCRIPTION OF LANDS BEING CONVEYED

Township 57 North, Range 103 West 6TH P.M. Park County, Wyoming:

Section 26: Northwest one-Quarter Southwest one-Quarter (NW¼SW¼), South one-half Southwest One-Quarter (S½SW¼)

Section 35: Northeast One-Quarter Northwest One-Quarter (NE¼NW¼)

The foregoing legal description is graphically illustrated on the "Record of Survey" attached hereto and by this mention made a part hereof and being subject to the building envelopes as shown on said "Record of Survey" and described in a separate document and also being subject to all rights of way and or easements that legally exist.

Modification in any way of the foregoing legal description terminates all liability of the surveyor who prepared that description.

S:\JOBS\2007\07-333\07-333 LD 2.doc



EXHIBIT

A



## WARRANTY DEED

**ROCK CREEK RANCH, INC.,** a Delaware corporation, of 142 Road 8RA, Clark, Wyoming 82435, Grantor, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, conveys and warrants to DALLY UP, LLC, a Wyoming Limited Liability Company, whose address is 89 Road 8RA, Clark, WY 82435, all of the real estate situated in County of Park, State of Wyoming, and described on the attached **Exhibit "A"** (the "Property"),

> **Together with** all improvements thereon and all appurtenances thereto, including all appurtenant water rights (provided that water rights are conveyed without warranties);

> **Subject to** reservations and exceptions in patents from the United States, prior mineral reservations and conveyances, exceptions, easements, restrictions, covenants and rights-of-way of record, unrecorded ditch easements, if any, and discrepancies, conflicts in boundary lines, shortages in area and encroachments which a correct survey and inspection would disclose;

> **And subject to** the following covenants, conditions, and restrictions:

I.      No residence or other structure, including, without limitation, outbuildings such as barns, storage sheds, shops, garages or other structures of any kind may be erected on the Property except on those parts of the Property described as "Building Envelope 1" and "Building Envelope 2" on the Record of Survey on the attached **Exhibit "A".** All structures currently on the Property which lie outside of the building envelopes described in **Exhibit "A"** and **Exhibit "B:** shall be deemed non-conforming structures, and if not removed by Grantee, may be maintained consistent with their current condition and uses, but may not be enhanced, replaced, expanded, or otherwise changed in exterior size or appearance, with the exception of the existing residence on the Property, depicted on Profile 6 in **Exhibit "B",** which may be expanded on the south side of the residence only, provided the height of any addition or expansion may not exceed the height of the existing structure. Nothing in this section shall be construed to limit the placement of driveways, irrigation lines, and pasture fences anywhere on the Property.

II.      The Property may not be divided or subdivided into more than two parcels, and the number of single-family residences on the Property shall never exceed three (3). No more than six (6) guest dwellings are allowed on the Property. Guest dwellings shall not to be occupied full-time and the cumulative square footage of occupiable space of all guest dwellings shall not exceed the single-family dwellings. No more than two (2) dormitories used in connection with operations as a school on the Property shall be permitted on the Property. For purposes of

this section, a dormitory shall not be considered a single-family residence or guest dwelling. No structure shall exceed a height of thirty-six (36) feet. These restrictions do not limit the right to construct outbuildings or other structures such as barns, pools, storage sheds, garages or other structures not used for occupancy by humans, provided they are otherwise not in violation of the covenants, conditions, and restrictions contained in this instrument. If an instrument has the effect of dividing the Property into two (2) parcels, that instrument shall allocate the total allowable single-family residences, guest dwellings and dormitories between the two (2) parcels.

III.    No business or commercial building, or signs or billboards advertising any business, may be erected on the Property. No commercial enterprise or other non-residential use may be conducted on the Property, provided that this provision shall not preclude the Grantee from conducting agricultural activities or any business from within the Grantee's home conducted electronically or by other means not involving external or visible activities or traffic. Nothing in this instrument shall prevent operation of the Property, as it is currently operated, as a school, provided such operations are otherwise not in violation of the covenants, conditions, and restrictions contained in this instrument.

IV.    No structure or associated improvements, except fences, utility lines, and irrigation lines shall be constructed on any part of the Property where the slope of the land exceeds thirty (30) degrees.

V.    There shall be no material alteration of the topography of the land, except in the case of reservoir construction, construction of structures and private roads, and final grading of outdoor pads and arenas, provided such acts do not otherwise violate the covenants, conditions and restrictions contained in this agreement.

VI.    All external lighting must be placed in the building envelopes identified in **Exhibit "B"** and the beams of all external lighting must point downward or otherwise be shaded so as not to direct or reflect light upward. External lighting on the Property shall not exceed the illumination requirements reasonably necessary for residential use, which may include not more than one (1) lighted outdoor arena. Further, no external lighting shall be placed on the Property, whether or not located within a building envelope, if such lighting will be visible from Station 0+00.00, as depicted on Profile 6, attached as **Exhibit "B"**.

VII.    Notwithstanding any other provision in this instrument, no structures of any kind shall be placed on the Property, whether or not located within a building envelope, such that it is visible from the Station 0+00.00 as depicted on Profile 6, attached as **Exhibit "B"**. Nothing in this section shall be construed to limit the placement of utility lines, pasture fences, and irrigation lines.

VIII.   The total ground area on the Property covered by impervious surface, including, without limitation, asphalt, concrete, artificial turf, or structures, but excluding roads and driveways, shall not exceed 100,000 square feet.

IX.   Consistent with all applicable laws and regulations, Grantee shall assure that adequate irrigation water is running through the Owens Ditch to supply the pond located on U.S. Forrest Service land, directly south of the Property, with adequate water for livestock, which graze on the U.S. Forrest Service land approximately one month each year and which is referred to in U.S. Forrest Service leasing documents as the "Road Lease."

X.   These covenants, conditions, and restrictions are declared to be covenants running with the land and also for the benefit of the County of Park, Wyoming, and adjoining property owners, and shall be fully enforceable by Grantor or Grantor's heirs, assigns, successors, or agents, the County of Park, Wyoming, and any person who owns property adjoining the Property conveyed in this instrument, and upon all persons acquiring the Property whether by descent, devise, purchase or otherwise, and any person by the acceptance of title to or any interest in the Property shall agree and covenant to abide by and fully perform the covenants, conditions and restrictions contained in this instrument. In the event the Property is sub-divided as allowed under this instrument, no owner shall be responsible for the violations of the covenants, conditions, and restrictions contained in this instrument committed by the owner or owners of any other portion of the Property, but the owner of each parcel shall have the right of enforcement under this instrument as to any violations occurring on the other parcel.

The covenants, conditions, and restrictions in this instrument shall be enforceable by injunction, specific performance, and any other remedy available in law or equity. Any person found to be in violation of the covenants, conditions, and restrictions in this instrument shall be required to pay for the cost of restoring the Property to a compliant condition and shall be responsible for the reasonable attorney's fees and other costs incurred by the Grantor or other person seeking to enforce this instrument, whether or not a formal court action is initiated.

The applicability and enforcement of this instrument shall be governed by the laws of the State of Wyoming.

In the event any portion of this instrument is deemed unenforceable or modified by a court, all other provisions shall remain in full force and effect.

Grantor hereby releases and waives all rights under and by virtue of the homestead exemption laws of this state.

DATED this _____ day of _____, 20___.

**ROCK CREEK RANCH, INC.**

By:_____
Title:_____

STATE OF _____ )
                   : ss
COUNTY OF _____ )

The foregoing **Warranty Deed** was acknowledged before me this _____ day of _____, 20___, by _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:_____



Roy Holm, PE & LS
Paul Blough, LS

# HOLM, BLOUGH and COMPANY

CONSULTING ENGINEERS AND LAND SURVEYORS
1402 Stampede Avenue, Cody, WY 82414
(307) 587-6281
Fax  587-6282
Email: bbco@tritel.net

June 10, 2010
Job No. 07-333

## ROCK CREEK RANCH, INC.
## LEGAL DESCRIPTION OF LANDS BEING CONVEYED

Township 57 North, Range 103 West 6TH P.M. Park County, Wyoming:

Section 26: Northwest one-Quarter Southwest one-Quarter (NW¼SW¼), South one-half
Southwest One-Quarter (S½SW¼)

Section 35: Northeast One-Quarter Northwest One-Quarter (NE¼NW¼)

The foregoing legal description is graphically illustrated on the "Record of Survey" attached
hereto and by this mention made a part hereof and being subject to the building envelopes as
shown on said "Record of Survey" and described in a separate document and also being subject
to all rights of way and or easements that legally exist.

Modification in any way of the foregoing legal description terminates all liability of the surveyor
who prepared that description.

S:\JOBS\2007\07-333\07-333 LD 2.doc

